■ In the Matter of Max Landau et al., Appellants, v New York City Loft Board et al., Respondents.—Determination of respondent New York City Loft Board, dated October 20, 1988, which denied petitioners' application for a hardship exemption pursuant to Multiple Dwelling Law § 285 (2) as to premises located at 307-309-311 Canal Street, is, in this proceeding brought pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, New York County [Myriam Altman, J.] entered on May 22, 1990), unanimously annulled, the petition granted, and the matter remanded for a new administrative hearing, without costs.

The instant proceedings commenced in 1983 when petitioners Max and Emma Landau, as owners of an interim multiple dwelling located at 307-309-311 Canal Street, applied to the New York City Loft Board for a hardship exemption from the requirements of article 7-C of the Multiple Dwelling Law. Article 7-C, popularly known as the Loft Law, was enacted to ensure that interim multiple dwellings, such as the one in this case, be brought into compliance with fire and safety standards applicable to residential buildings, so that those persons who had come to reside in such buildings could continue to do so. Among the requirements necessary for compliance, the

continued legal residential occupancy, is that no part of the building be used for a high fire hazard occupancy as defined in 12 NYCRR 44.4. (Multiple Dwelling Law § 277 [3]; § 284 [1] [i].)

In order for an owner of such a building to qualify for a hardship exemption under section 285 (2) (i) of the Multiple Dwelling Law, he or she has the burden of proving by a preponderance of the evidence that compliance with the standards set forth in article 7-C would, insofar as is relevant here, cause "an unreasonably adverse impact on a non-residential conforming use tenant within the building". The statute further mandates that the test for determining if there has been such an impact is "whether residential conversion would necessitate displacement" (§ 285 [2] [d]) of the nonresidential tenant.

The basis for the application in this case was a claim that enforcement of the statute would cause an unreasonably adverse impact on petitioner Diversified Plastic Suppliers, Inc. ("Diversified"), of which Max Landau owns a 75% interest, and which has operated a plastics business on the premises since 1968 and currently occupies 65% of the total square footage of the premises and employs 24 persons. The other tenants of the building include a hardware store, which occupies portions of the basement and the first and second floors, Bristol Engraving Company, which occupies part of the fifth floor, and residential tenants, who are among the respondents in this proceeding, and who, commencing in 1977, began to occupy the remainder of the fifth floor and the entire third floor.

Petitioners claimed that Diversified manufactured and stored high fire hazard plastic products on the premises and that the continuance of this use was essential to Diversified's survival. Petitioners also stated that the New York City Buildings Department had twice denied applications to convert the building to legal residential use, after petitioners had informed it of the types of activities in which Diversified was engaged.

Respondents asserted that their tenancies would be terminated if the hardship application were granted and claimed that requiring compliance with the standards would not create such hardship on Diversified as to cause its displacement.

At the hearing on the application, petitioners attempted to introduce invoices and purchase orders to demonstrate that Diversified had been continuously engaged in the sale and storage of materials which constituted a high fire hazard. The

Hearing Officer, however, required petitioners to select representative documents from the voluminous documentation offered. According to an affidavit by the Hearing Officer, her reason for limiting the proof was that she was already convinced that "the nature of Diversified's business at the building (such as the storage, manufacturing and sale of high fire hazard materials and uses) was high hazard, and that Diversified's dollar volume was derived from high hazard operations".

The Loft Board, in a four to three decision, nevertheless denied the application. The Board found that, although a 1986 Fire Department inspection had revealed that there were some ongoing high fire hazard uses in the building, petitioners had failed to demonstrate that a sufficient percentage of Diversified's business was derived from high hazard uses, so as to cause an unreasonably adverse impact necessitating that it either move or shut down.

It is clear, however, that petitioners had attempted to offer further proof of the extent of Diversified's revenue from high hazard activities and had been prevented from doing so by the Hearing Officer. Under these circumstances, and particularly since the Loft Board's decision rested squarely on petitioners' failure of proof as to the very fact which these documents had been offered to establish, petitioners did not receive a fair hearing.

We therefore remand for a new administrative hearing on the issue of what percentage of Diversified's income is derived from high fire hazard uses and whether the cessation of those used would have such an unreasonably adverse impact that it would necessitate its displacement. Should the Board find in petitioners' favor, it would then have to reach the additional arguments raised by respondents as to why a hardship exemption should not be granted, i.e., that any hardship was self-created and that alternate means of compliance exist which would permit both Diversified and the residential occupants to coexist legally at the premises. Concur—Sullivan, J. P., Ellerin, Wallach, Ross and Smith, JJ.